[Crim. No. 12364. In Bank. Jan. 29, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD WALTER KING, Defendant and Appellant.

**COUNSEL**

Molly H. Minudri, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Thomas S. Kerrigan and Ronald M. George, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BURKE, J.**—Ronald Walter King pleaded guilty to first degree murder. It was stipulated that the court might read the preliminary hearing transcript for the purpose of approving the plea and determining the degree. After reading the transcript the court approved the plea and stated that it determined the murder to be in the first degree. At the proceeding to determine the penalty a jury fixed the penalty at death. Motions for a new trial and for reduction of the sentence were denied, and defendant's automatic appeal is now before us (Pen. Code, § 1239, subd. (b)).

Defendant contends that the court erred in denying his motion to allow him, over the prosecutor's objection, to waive a jury trial on the issue of penalty; that error was committed in selecting the jury; and that it was improper for the prosecutor to make certain remarks to the jury panel. We have concluded that none of the contentions can be upheld and that the judgment should be affirmed.

On the evening of August 13, 1966, defendant entered Al's Liquor Store in Bellflower to commit a robbery, while his companion, Kenneth Watson, waited in a car outside.[1] Two customers were in the store, and, after they left, defendant shot and killed the clerk, Dennis Sponseller, with a shotgun. The victim was unarmed. Evidence indicated that the muzzle of the shotgun was six to eight feet from the victim when the gun was fired. The autopsy surgeon testified that death occurred within minutes and was caused by a shotgun wound, which perforated the heart.

Defendant's fingerprints were found on the cash register, the drawer of which remained closed although several keys were depressed, and only a penny was found in the victim's pockets. The owner of the store testified that $160 was missing and that it was the practice of the store for the clerk to keep money in his pocket or a drawer for cashing checks.

Defendant, testifying in his own behalf, admitted shooting the decedent during an attempt to perpetrate a robbery. He stated that at the time in question he was living with the Kenneth Watsons, that they were "broke," and that Watson suggested committing the robbery. He testified that he did not deliberately fire the gun, that it "just went off," and that he was scared and left without obtaining any money. He denied telling Mrs. Watson on the night of the murder that he shot the victim on seeing him reach under a counter thinking he was going for a gun or alarm button. In rebuttal Mrs. Watson stated that defendant had made such a statement that night.

---

[1] It appears from remarks of the prosecutor that Watson was convicted of the murder, and Watson testified that he had an appeal pending. He is not a party to the present appeal.

Defendant also testified that he had never previously been involved in a crime of violence. On cross-examination he admitted having been convicted of two prior felonies—each of which related to "bad checks." He stated that he was currently in a federal prison as a result of one of the convictions. Two officers at the prison, called as defense witnesses, testified that defendant had been cooperative and polite during the past six months.

After entering his guilty plea, defendant indicated that he wished to waive a jury trial on the issue of penalty. The prosecutor refused to join in the waiver, and defendant moved that he nevertheless be permitted to waive a jury trial. The motion was denied, and defendant contends that the court thereby erred. We do not agree.

Article I, section 7, of the California Constitution provides: "The right of trial by jury shall be secured to all, and remain inviolate. . . . A trial by jury may be waived in all criminal cases, by the consent of *both parties,* expressed in open court by the defendant and his counsel. . . ." (Italics added.) This section does not guarantee the right to trial by jury to determine the issue of penalty, and under former practice a defendant did not have a right to a jury trial on that issue after a guilty plea. (*People v. Hough,* 26 Cal.2d 618, 620-621 [160 P.2d 549] [cert. dism'd. 326 U.S. 691 [90 L.Ed. 407, 66 S.Ct. 232]].) However, Penal Code section 190.1, enacted in 1957, provides "If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived," and by its terms the provision in the quoted constitutional section regarding the method of waiver is applicable in a proceeding to determine the penalty. In *People v. Washington,* 71 Cal.2d 1061, 1086-1087 [80 Cal.Rptr. 567, 458 P.2d 479], wherein a jury found the defendant guilty of various crimes including murder and fixed his penalty at death, the defendant claimed on appeal that the rejection by the prosecution of his offer to waive a jury trial was a denial of his "constitutional right to waive a trial by jury," and this court, relying on our constitutional provision and authority such as *Singer* v. *United States,* 380 U.S. 24 [13 L.Ed.2d 630, 85 S.Ct. 783], concluded that the claim lacked merit. (See also *People* v. *Spencer,* 170 Cal.App.2d 145, 149 [338 P.2d 484] [cert. den. 361 U.S. 949 [4 L.Ed.2d 382, 80 S.Ct. 405]].)

In *Singer* v. *United States, supra,* 380 U.S. 24, 36 [13 L.Ed.2d 630, 638, 85 S.Ct. 783], wherein the defendant challenged a federal rule that conditioned a defendant's waiver of a jury trial on consent of the court and the prosecutor, the court stated, "A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to

consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him." *Singer* also stated (at p. 37 [13 L.Ed.2d at p. 639]), "We need not determine in this case whether there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial." Here no claim is made, nor does it appear, that such circumstances were present.

In arguing that it was error not to accept his waiver of a jury at the penalty trial, defendant cites *People v. Jones,* 52 Cal.2d 636 [343 P.2d 577], wherein it was recited that defense counsel and defendants waived a jury trial on the issue of penalty and that the trial court determined the penalty, and *Jones* stated that the procedure was correct. Although *Jones* did not recite that the prosecutor joined in the waiver, nothing therein shows that he did not do so, and the matter was not discussed.

Eight veniremen were excused for cause on the basis of their attitude toward the death penalty. Defendant contends that under *Witherspoon v. Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], it was error to excuse them. ■ Although *Witherspoon* was decided after defendant's trial, it is applicable herein. (*Witherspoon v. Illinois, supra,* 391 U.S. 510, 523, fn. 22 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].)

*Witherspoon* holds that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Id.* at p. 522 [20 L.Ed.2d at pp. 784-785].) The court excepted from this ruling veniremen who "made unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . ." (*Id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

■ In determining whether a venireman comes within this excepted group we must "assess the responses of the venireman in the full context of that portion of the court and counsels' *voir dire* examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause. To ascertain what the juror meant by what he said, we must consider not merely the words of his answers but also the words of the questions he was asked and additionally all of the circumstances in which the colloquy took place." (*People v. Varnum,* 70 Cal.2d 480, 492 [75 Cal.Rptr. 161, 450 P.2d 553].)

Here the phrase "in a proper case" was repeatedly employed in questioning the veniremen concerning their attitude toward the death penalty, and that phrase, if considered by itself, is ambiguous. (See, e.g., *People* v. *Nye,* 71 Cal.2d 356, 365-366 [78 Cal.Rptr. 467, 455 P.2d 395]; *People* v. *Varnum, supra,* 70 Cal.2d 480, 494; *People* v. *Teale,* 70 Cal.2d 497, 514-515 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Morse,* 70 Cal.2d 711, 741 [76 Cal.Rptr. 391, 452 P.2d 607].) As pointed out in *Teale* (at p. 515) "in the absence of additional language which might explain its content or nullify its effect, the phrase might easily suggest to a venireman that the law classes certain kinds of cases as 'proper' for the infliction of the death penalty and that, if the defendant is found guilty of a crime of this class, the jury will be *required* to impose the death penalty." However, as we shall see, in the instant case as in *People* v. *Varnum, supra,* 70 Cal.2d at pages 494-496, and *People* v. *Nye, supra,* 71 Cal.2d at pages 365-367, it was made clear to the veniremen that what was a proper case was within the determination of each individual juror.

On the first day of the jury selection proceedings before any venireman was excused for cause the court addressed the jury panel as follows:

"The law provides that every person guilty of murder in the first degree shall suffer death or confinement in the State Prison for life. The determination of the penalty of life imprisonment or death shall be in the discretion of the jury, which is now to be selected. . . . *The law imposes neither death nor life imprisonment, but presents the two alternatives to the absolute discretion of the jury. The legislature has formulated no rules to control the exercise of the jury's discretion. . . .*

"*Both the People and the defendant are entitled to the individual opinion of each juror. That means that each of you for yourself must determine the penalty of life imprisonment or death. . . .*

"Where the offense charged is punishable by death, the Court is required to ascertain if any prospective juror entertains such a conscientious opinion that he would, under no circumstances, vote for the death penalty in a proper case. If you entertain such conscientious opinion, the law provides that you will not be permitted or compelled to serve as a juror." (Italics added.)

It is manifest that the quoted remarks made it clear that what was a proper case was for the individual juror to decide, even though the remarks did not include an express statement to that effect.

Immediately after the court's remarks the first three veniremen in question (Mrs. Foster, Mrs. Brough, and Mr. Kirschner) were examined and excused for cause, and on the second day of the jury selection proceedings the next four veniremen in question (Mrs. Tharp, Mrs. Ackerman, Mrs. Shadburn, and Mrs. Bair) were excused for cause following their examination. The relevant *voir dire* of the seven is set forth below.[2] It may be

---

[2]*Veniremen Foster and Brough*

THE COURT: "If the answer to the question I am about to [ask] is yes, please hold up your hand. . . . Is there any person in the jury box who entertains such conscientious opinions that he would, under no circumstances, vote for the death penalty in a proper case?" Mrs. Foster and Mrs. Brough thereupon raised their hands, and the following questioning ensued:

"VOIR DIRE EXAMINATION OF MRS. FOSTER
"BY MR. CULLUM [defense counsel]:

"Q. Mrs. Foster, to be absolutely certain that we understand each other, may I ask you if your feelings—that the feelings that you have expressed just now, or with— that you have no doubt at all that under no circumstances could you ever vote for the death penalty, regardless of the nature of the crime, the background of the offender, and so forth, can you conceive, without describing to me, what such case might be that if the facts were of sufficient gravity that you might conceivably vote for the death penalty?

"A. Well, I'm against capital punishment as such.

"Q. And I recognize that many people are.

"Is your position that you would prefer not to have that punishment provided by our law?

"If you had an opportunity, for example, to vote whether capital punishment should be abolished in California, may I assume that you would vote in that direction?

"A. Yes.

"Q. All right. The question, as I comprehend it, that the Court has addressed to you, is not do you favor the abolition of capital punishment, but could you in a proper case vote that one person should suffer the death penalty, or do you feel that this is—that you are utterly capable [*sic*] of that under any condition?

"A. Well, I feel on a religious basis that I couldn't do it.

"MR. CULLUM: Thank you.

"VOIR DIRE EXAMINATION OF MRS. BROUGH
"BY MR. CULLUM:

"Q. Mrs. Brough, you heard the questions that I put to Mrs. Foster, and the answers that she has given?

"(No response.)

"Q. Can you give us the benefit of your thinking—understanding—the particular concern that we have?

" . . . . . . . . . . . . .

"A. I do not believe the solution is when someone has killed to kill also.

"Q. BY MR. CULLUM: Is your feeling based upon religious or philosophical grounds?

"A. Probably both.

inferred that all seven heard the court's remarks and that the veniremen excused on the second day also heard statements by defense counsel and

"Q. All right. We're not here to debate that question.

"You understand at this time that the only problem before us right now is whether you yourself would find it impossible because of your conscientious feelings in any case to vote that one person should die?

"A. I do."

The court then granted the prosecutor's challenge of veniremen Foster and Brough for cause.

### Venireman Kirschner

"THE COURT: Do you entertain such conscientious opinion that you would under no circumstances vote for the death penalty in a proper case?

"MR. KIRSCHNER: Yes, I am of such an opinion.

"THE COURT: You do? And what is your opinion?

"MR. KIRSCHNER: Well, I do not believe in capital punishment.

"THE COURT: You may inquire, Mr. Cullum.

"VOIR DIRE EXAMINATION OF MR. KIRSCHNER

"BY MR. CULLUM:

"Q. Mr. Kirschner, I'm sure you understand from the questions that I asked of Mrs. Foster and Mrs. Brough the nature and extent of our concern here. And to be absolutely certain that we've —we all understand each other, do you understand what we are putting to you? The question that we are asking you is not whether you approve philosophically or disapprove of the death penalty itself, but whether, in a proper case, whatever that may be, you could vote to impose such a sentence?

"A. I understand this.

"Q. Let me put it this way: You know nothing of the facts in this case so far, I take it?

"A. That's correct.

"Q. Can you conceive of a crime that you might regard as so terrible that you could impose the death penalty?

"A. No, sir."

The court then granted the prosecutor's challenge for cause.

### Venireman Tharp

"THE COURT: . . . Do you entertain such conscientious opinions that you could, under no circumstances, vote for the death penalty in a proper case?

"MRS. THARP: No, I sincerely believe I could not bring in a verdict at any time regarding the death penalty.

"THE COURT: Do you wish to inquire, Mr. Cullum?

"MR. CULLUM: Your Honor, I think her answer is unequivocal.

"MR. SHELDON [the prosecutor]: I have no questions, your Honor.

"THE COURT: Mrs. Tharp, you're excused by the Court."

### Venireman Ackerman

"THE COURT: . . . Do you entertain such conscientious opinions that you would, under no circumstances, vote for the death penalty in a proper case?

"MR. [sic] ACKERMAN: I feel that we should have a government by law, but I don't think that I personally could vote for the death penalty.

"THE COURT: Would you have conscientious scruples against imposing the death penalty in a proper case?

"MRS. ACKERMAN: I can't put it any better than I did. I suppose that's what I mean. I have to admit that—the propriety of it as long as it is the law, but—

"THE COURT: No, the law is this: If you entertain conscientious opinions, the law provides that you will not be permitted, or compelled, to serve as a juror. The law

the prosecutor during questioning of numerous veniremen, which likewise made it apparent that what was "a proper case" was for each individual

provides that in the case of a person who has the conscientious opinion concerning the—

"MRS. ACKERMAN: Well, I do have one; that is what I mean to say.

"THE COURT: You do have a conscientious opinion which would—

"MRS. ACKERMAN: Yes, sir.

"THE COURT: —which would prevent you from voting for the death penalty even though you might—you thought it might be a proper case; is that right?

"MRS. ACKERMAN: That's right.

". . . . . . . . . . . . .

"VOIR DIRE EXAMINATION OF MRS. ACKERMAN

"BY MR. CULLUM:

"Q. Mrs. Ackerman, it would seem to be quite clear that if it is up to you you would vote to abolish the death penalty; is that right?

"A. That's right.

"Q. But, of course, as things stand now, this law of our state does permit the death penalty to be disposed in the discretion of the jury. It doesn't say that if you believe someone to be guilty that you're compelled to vote for the death penalty; it says only that you may.

"Particularly, what we're concerned about here is whether you, under any circumstances—can you conceive, for example, of a crime so terrible, or a person so deprived, that you could bring yourself to vote to put him to death? That's what we are talking about.

"A. I understand that, sir. That's what I mean; that I personally could not even though I—I suppose I said the other. I believe in government by law, and that is the law; so I have to accept the propriety of it in that sense, but not that I could be party to it; that is what I am trying to say.

"MR. CULLUM: I think Mrs. Ackerman's answers are clear and unequivocal, your Honor.

"THE COURT: Yes.

"The law goes on to make it clear—the law does not require or permit a juror who has a conscientious opinion against the death penalty in the respect I have heretofore asked you, and you do have such a conscientious opinion?

"MRS. ACKERMAN: Yes."

A challenge for cause by the prosecutor was then granted.

*Venireman Shadburn*

"THE COURT: Do you entertain such conscientious opinions that you would, under no circumstances, vote for the death penalty in a proper case?

"MRS. SHADBURN: I do.

"THE COURT: Your conscientious opinions are such that no matter what the evidence in the case should be, you would not be able to vote for the death penalty; is that correct?

"MRS. SHADBURN: That is correct."

Defense counsel and the prosecutor stated they had no questions, and the court then granted the prosecutor's challenge for cause.

*Venireman Bair*

"THE COURT: Do you entertain such conscientious opinions that you would, under no circumstances, vote for the death penalty in a proper case?

"MRS. BAIR: I do.

"THE COURT: No matter what the evidence in the case shows, your opinions are such that you could not vote for the death penalty?

juror to decide.[3] The answers of each of the seven, in the light of the context, made it unmistakably clear that he or she would vote against the death penalty automatically and regardless of the evidence in the case.

The eighth venireman in question (Mr. Baugh) was excused for cause on the third day of the jury selection proceedings. His entire *voir dire* examination is set forth in the footnote.[4] The record is unclear whether he was present when the court made its remarks on the first day of the jury selection proceedings. It appears that on the afternoon of the second day of such proceedings the court stated it would address its remarks "to the members of the jury panel who have just entered into the courtroom." The court at that time repeated many of its previous comments.[5] It informed the venire-

---

"MRS. BAIR: I could not because of my religion.

"THE COURT: On the basis of your religious beliefs, it would prevent you from voting for the death penalty?

"MRS. BAIR: Yes, sir."

Defense counsel and the prosecutor stated that they had no questions, and the court then granted the prosecutor's challenge for cause.

[3]Such an inference is warranted since the record contains nothing showing that they were not then present or did not hear.

Examples of the statements by defense counsel and the prosecutor are the following: Defense counsel: "Did *you* understand from what the judge had said that in making this determination [of death or life imprisonment] that it lies entirely in *your* hands without anything to guide you but your own conscience? . . . And no one here is going to—the judge is not going to tell you, for example, that you have to determine that certain things are true before you can vote for one penalty or the other. This decision is something that will have to come out of *your* own individual mind, heart and conscience; you know that?" (Italics added.)

The prosecutor: "And as [defense counsel] has said, [the choice of death or life imprisonment] is completely and solely in *your* discretion. There are no guidelines, no standards. . . . And do you feel that if *you* were selected to sit, and after you heard all of the evidence, that—if *you* honestly and conscientiously concluded that the death penalty was the proper punishment, that you could vote that in the jury room?" (Italics added.)

[4]*Venireman Baugh*

"THE COURT: Mr. Baugh, do you entertain such conscientious opinions that you would, under no circumstances, vote for the death penalty in a proper case?

"MR. BAUGH: I didn't think I would until now, but I do think—

"THE COURT: Are those conscientious opinions on a religious ground?

"MR. BAUGH: No, personal.

"THE COURT: Just personal grounds?

"MR. BAUGH: Yes, your Honor.

"THE COURT: You are firm in your conviction, however, that even in a proper case you would not vote for the death penalty—

"MR. BAUGH: I don't feel that I would, yes, sir.

"THE COURT: —is that right? You challenge for cause?

"MR. SHELDON: Yes, your Honor.

"THE COURT: You may be excused."

[5]On the afternoon of the second day the court stated:

"The law provides that every person guilty of murder in the first degree shall suffer

men that the determination of the penalty of death or life imprisonment was within the absolute discretion of the jury and further stated that "The legislature has formulated no rules to control the exercise of *the juror's discretion.*" (Italics added.) Although the court did not repeat its earlier comments to the effect that each juror individually must decide between the two penalties, that fact was suggested by the italicized words, and subsequent questioning by defense counsel and the prosecutor of various veniremen before Mr. Baugh was excused made it clear that the decision as to penalty was not only the collective decision of the jury as a whole but was necessarily an individual decision for each juror.[6] In the light of their context, the answers of Mr. Baugh made it unmistakably clear that he would vote against the death penalty automatically and regardless of the evidence in the case.

The present case differs from *People v. Teale, supra,* 70 Cal.2d 497, 512-518, and *People v. Morse, supra,* 70 Cal.2d 711, 739-742, wherein we concluded that it had not been made clear to the veniremen that what was a proper case was within the determination of each individual juror and that it was therefore error under *Witherspoon v. Illinois, supra,* 391 U.S.

death or confinement in the State Prison for life. The determination of the penalty of life imprisonment, or death, shall be in the discretion of the jury, which is at present being selected.

"⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

"The law imposes neither death nor life imprisonment but presents the two alternatives to the absolute discretion of the jury.

"The legislature has formulated no rules to control the exercise of the juror's discretion.

"Where the offense charged is punishable by death, the Court is required to ascertain if any prospective juror entertains such conscientious opinions that he or she would, under no circumstances, vote for the death penalty in a proper case. If you entertain such conscientious opinions, the law provides that you will not be permitted, or compelled, to serve as a juror."

On the third day of the jury selection proceedings, before Mr. Baugh was examined, the court repeated the quoted statements without substantial change except that on that occasion the court stated, "The legislature has formulated no rules to control the exercise of the jury's [rather than juror's] discretion."

[6]For example, defense counsel, after stating that the determination of penalty was "in the sole discretion of the jury" and that it was unnecessary for defendant to produce evidence in mitigation to persuade them to vote for life imprisonment or for the prosecution to produce evidence in aggravation to persuade them to vote for the death penalty, stated, "What I'm trying to get at is this: Do *you* quite clearly understand that so far as the law is concerned, these two penalties are regarded as on a par with each other? They're merely there for *you* to make the choice?" (Italics added.)

The prosecutor repeatedly asked questions such as, "Is it fair to say that *you're* of such a frame of mind that *you're* willing to conscientiously weigh everything that you hear so far as evidence is concerned, listen to everything that's said by counsel and the Court, and then conscientiously decide the proper penalty at the end of this case?" (Italics added.)

510 to excuse for cause veniremen who, after manifesting opposition to capital punishment in general language, responded in the affirmative to the court's inquiry whether such opposition would prevent them from rendering the verdict of death "in a proper case" or who responded in the affirmative to similar questions. In neither *Teale* nor *Morse* does it appear that the veniremen were informed, as they were here, that the jury has absolute discretion in determining whether the penalty should be death or life imprisonment, that the Legislature has formulated no rules to control the exercise of the jury's discretion, and that each juror for himself must determine the penalty of death or life imprisonment. Furthermore in *Teale,* unlike the instant case, the *voir dire* examination of veniremen was fraught with statements that could only have produced confusion as to the meaning of the term "proper case."

The instant case also differs from *People* v. *Ketchel,* 71 Cal.2d 635 [79 Cal.Rptr. 92, 456 P.2d 660], wherein the majority concluded that the meaning of the phrase "proper case" had not been properly explained and that it was therefore error to exclude for cause a venireman who replied in the negative to the crucial question "And if you felt from the evidence that this was a proper case for the imposition of the death penalty, could you vote for the imposition of the death penalty if you believed that it was a proper case?" In *Ketchel* the court's introductory remarks informed the veniremen that the "jury" has "a wide discretion" in determining between life imprisonment and death and thereafter referred to the "absolute discretion of the jury" on the issue. The majority stated that "the discrepancy" was not explained to the veniremen, that "the designation of the jury collectively does not establish that the juror must reach an individual decision on the issue," and that the record showed that the questions as to "proper case" left the jurors in a state of confusion. Here, however, the court's remarks correctly informed the veniremen of the "absolute discretion" of the jury in selecting between the two penalties and did not mention "wide discretion," and it does not appear that veniremen were confused by the questions relating to "proper case." Rather the responses of venireman after venireman indicated that no misunderstanding resulted from the use of the quoted phrase.[7]

---

[7]For example, the second venireman excluded for cause on the ground of her attitude toward the death penalty (Mrs. Brough) in reply to the question "You understand at this time that the only problem before us right now is whether you yourself would find it impossible because of your conscientious feelings in any case to vote that one person should die?" stated "I do."

Venireman Bair replied in the affirmative to the questions "Did you understand from what the judge had said that in making this determination [between life imprisonment and death] that it lies entirely in your hands without anything to guide you but your own conscience?" and "And no one here is going to—the judge is not going

■ Three of the veniremen excused for implied bias indicated that their inability to return a death penalty under any circumstances was based in whole or in part on their religious beliefs. (See *voir dire* examination of Mrs. Foster, Mrs. Brough, and Mrs. Bair in fn. 2.) Defendant contends that their exclusion was forbidden by section 4 of article I of the California Constitution, which provides "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this State; and no person shall be rendered *incompetent* to be a . . . juror on account of his opinions on matters of religious belief. . . ." (Italics added.)

The contention cannot be upheld. *People* v. *Rollins,* 179 Cal. 793, 796-797 [179 P. 209], in rejecting a claim that Penal Code section 1074, subdivision 8,[8] violated section 4 of article I of our state Constitution, stated in part, "Section 1074 of the Penal Code has nothing whatever to do with any question of 'competency' of jurors, a matter covered by sections 198 and 199 of the Code of Civil Procedure, and section 1046 of the Penal Code. That section prescribes grounds of challenge for implied bias, matters going to the ability of the juror, regardless of his competency to act as a juror generally, to fairly and impartially try the particular case in accord with the law applicable thereto." Arguments by defendant that *Rollins* is no longer applicable are devoid of merit.

Defendant next appears to complain of the court's failure to excuse for bias numerous veniremen who assertedly showed "a predisposition toward the death penalty." ■ However, defendant did not challenge these veniremen for cause, and the general rule is that any challenge for cause must be seasonably made or is waived. (*People* v. *Young,* 21 Cal.App.2d 423, 428 [69 P.2d 203]; cf. *Riley* v. *Davis,* 57 Cal.App. 477, 484 [207 P. 699]; see Witkin, Cal. Criminal Procedure (1963) p. 397.) ■ Furthermore the answers of some of the veniremen pointed to by defendant were merely statements such as that they favored retention of the death penalty, and such statements manifestly do not show either implied bias under Penal Code section 1074 or actual bias under Penal Code section 1073. Other of the veniremen in question were excused on peremptory challenge by the prosecutor, and hence defendant could not have been harmed by the fact that they were not excused for cause. The remaining venireman made

---

to tell you, for example, that you have to determine that certain things are true before you can vote for one penalty or the other. This decision is something that will have to come out of your own individual mind, heart and conscience; you know that?"

[8]Section 1074 reads: "A challenge for implied bias may be taken for . . . any of the following causes . . . 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror."

statements that might be regarded as conflicting relating to whether he believed that the death penalty should be imposed in all robbery-murder cases. This venireman was thereafter excused on a peremptory challenge by defendant. ■ Even if it were assumed that a challenge for cause should have been made and would have been allowed, it does not appear that defendant was harmed by the fact that he removed the venireman instead by a peremptory challenge. Although defendant thereafter exhausted his peremptory challenges, the record does not show that he desired to exercise any additional peremptory challenges or had any objection to any of the 12 jurors who were sworn to try the cause.

■ There is no merit to defendant's contention that it was improper for the prosecutor, in addressing the jury panel, to make specified statements to the effect that the state was seeking the death penalty. (See *People* v. *Spencer,* 60 Cal.2d 64, 76 [31 Cal.Rptr. 782, 383 P.2d 134] [cert. den. 377 U.S. 1007 [12 L.Ed.2d 1055, 84 S.Ct. 1924]].)

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied February 25, 1970. Peters, J., was of the opinion that the petition should be granted.